**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-1130

CHRISTOPHER FINN,

     Plaintiff,

v.

CITY OF FORT COLLINS, and
OFFICER WILLIAM KILCOYNE, in his individual capacity.

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Christopher Finn, by and through his attorney, Sarah Schielke of The Life & Liberty Law Office LLC in Loveland, Colorado, respectfully alleges for his *Complaint and Jury Demand* as follows:

### INTRODUCTION

1. On April 10, 2023, Fort Collins Police Services Officer William Kilcoyne was investigating a call from a Dick's Sporting Goods Store employee that an individual inside may have committed petty theft. Plaintiff Christopher Finn exited the store shortly thereafter carrying a pair of shorts and a receipt for their purchase. Defendant Kilcoyne determined Mr. Finn appeared to match the description that had been given by the employee, and attempted to talk to Mr. Finn, asking him if "anything weird" had happened in the store. Mr. Finn said "no" and then took off running down the sidewalk towards the dark and empty Dick's parking lot. Defendant Kilcoyne immediately pulled out his Taser, pointed it at Mr. Finn's sprinting back, and without warning or command, summarily electrocuted him from behind. Mr. Finn

1

experienced instant neuromuscular incapacitation and (no longer having the ability to control his arms or legs) flew face first down into the pavement at high speed. The impact caused Mr. Finn to suffer numerous injuries, including fractures to his nasal bones, a frontal scalp edema, concussion, traumatic injury to his jaw, multiple second degree abrasions to his arms, and a deep laceration to his chin (with bone being visible) and nose, requiring numerous sutures.

2. Prior to tasing the sprinting Mr. Finn in the back, Defendant Kilcoyne had not: (1) told Mr. Finn he was not free to leave, (2) told Mr. Finn to stop, (3) told Mr. Finn he was under arrest, nor (4) given Mr. Finn any verbal warning that he was about to use dangerous physical force on his person.

3. Defendant Kilcoyne's use of the Taser on Mr. Finn violated multiple aspects of Taser training related to safety and avoiding serious injury to the subject. Defendant Kilcoyne's use of the Taser on Mr. Finn also violated multiple provisions of written FCPS policy governing the same. Despite these realities, every supervisory officer at FCPS to review Kilcoyne's use of force ratified and approved of it as reasonable, appropriate, and within training and policy.

4. FCPS chain of command approved of Kilcoyne's excessive and reckless use of dangerous force on Mr. Finn because it is the custom and practice at FCPS to ratify officers' excessive uses of force on individuals who present no threat to the officer or public. FCPS accomplishes this by re-interpreting its own written policies to be ambiguous enough to permit the excessive use of force at issue.

5. Plaintiff brings this civil rights action pursuant to § 13-21-131, C.R.S. and 42 U.S.C. § 1983 and 1988 for various forms of relief, to include compensatory damages and attorneys fees, stemming from Defendants' violations of Plaintiff's rights guaranteed by the Fourth and

Fourteenth Amendments to the Constitution of the United States and Article II, Section 7 of the Colorado Constitution.

## JURISDICTION AND VENUE

6. The federal claims in this action arise under the Constitution and laws of the United States and are brought pursuant to 42 U.S.C. § 1983. The state claims in this action arise under the Constitution of the State of Colorado and are brought pursuant to section 13-21-131 of the Colorado Revised Statutes.

7. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 and 1343(a)(3).

8. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988 and § 13-21-131(3), C.R.S.

9. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado or were directed at individuals within the State of Colorado.

## PARTIES

10. Plaintiff, Christopher Finn, is a citizen of the United States and was at all times relevant hereto a resident of and domiciled in the State of Colorado. He currently resides in the County of Arapahoe in the State of Colorado.

11. Defendant Fort Collins police officer William Kilcoyne ("Officer Kilcoyne") was at all times relevant to this complaint duly appointed and sworn as a police officer working for Fort Collins Police Services. Officer Kilcoyne is a named Defendant in his individual capacity.

12. Defendant City of Fort Collins is a governmental entity and municipality incorporated under the laws of the State of Colorado for purposes of liability under 42 U.S.C. § 1983 and the Fort Collins Police Services is a department of City of Fort Collins. Defendant City of Fort Collins

enforces local and state law through its law enforcement agency, the Fort Collins Police Services ("FCPS").

13. At all times relevant to this Complaint, Defendant City of Fort Collins employed and was responsible for the oversight, supervision, discipline and training of FCPS personnel, including Officer Kilcoyne.

14. Defendant City of Fort Collins (referred to herein interchangeably as "the City," "Fort Collins," and "FCPS") is a Colorado municipal corporation and is the legal entity responsible for itself and for Fort Collins Police Services ("FCPS").

**FACTUAL ALLEGATIONS**

15. At about 8:30 pm on April 10, 2023, an employee at the Dick's Sporting Goods store in Fort Collins called Fort Collins Police Services's non-emergency line to report a possible shoplifting in progress.

16. Defendant Officer William Kilcoyne heard dispatch air the call over the radio and asked to be assigned to it. He had a civilian ridealong with him that day (a Weld County Sheriff's Office jail deputy named Aaron McKay) and they hadn't yet seen any action on his shift.

17. The information relayed from the Dick's employee to Officer Kilcoyne by dispatch through CAD was as follows:

- There is a male in the store informant believes is cutting off sensors from some sweatpants in the fitting room

- His description: "white male, white tshirt, khaki jeans, gray bball cap, with glasses on top"

- Informant is unsure how he is cutting sensors off

- The male is alone

4

- The informant has been watching him but hasn't seen indication that he has a weapon, or that he has a vehicle

- The male is checking out and paid for one pair of shorts

18. Officer Kilcoyne and his ridealong were on scene within seconds. Kilcoyne was in full police uniform, armed with multiple weapons. His ridealong Deputy McKay was in plainclothes.

19. Dispatch assigned a cover officer to cover Officer Kilcoyne, who advised Kilcoyne she was less than a minute away and en route. Kilcoyne told her to go cover the mall exit while he would cover the west exit.

20. Officer Kilcoyne and his ridealong parked and walked over to the west exit of the store to wait for the male to emerge. While standing there, he stated to his civilian ridealong: "So if I need your help, you are sworn to help me. Just need reasonable force."

21. Kilcoyne then requested dispatch provide him with the description of the male again.

22. After about 30 seconds, Plaintiff Christopher Finn emerged from the store's exit, carrying a pair of shorts and the receipt for their purchase.

23. Officer Kilcoyne quickly approached Mr. Finn and said, "Hey sir. Hey. What's up? Hey, can you stop real quick?"

24. Mr. Finn stopped walking and said, "Yeah?"

25. This exchange between Officer Kilcoyne and Mr. Finn followed:

KILCOYNE:     My name's Officer Kilcoyne. I know you were in there shopping, but we got a call that maybe something weird happened in there.

FINN:         No sir, I just… [holds up pair of shorts and receipt, looks confused]

KILCOYNE:     Do you have your ID on you real quick?

| FINN: | I don't. |
|---|---|
| KILCOYNE: | Will you do me a favor, just put your butt up against the wall for me? |
| FINN: | Yeah. |
| KILCOYNE: | Cool. |

26. Mr. Finn turned and then began running down the sidewalk toward the parking lot.

27. The area was well lit and there were no civilians present or visible anywhere in sight.

28. Officer Kilcoyne immediately gave chase, running after Mr. Finn. He also (literally) immediately pulled out his Taser and pointed it at Mr. Finn's back.

29. In his excitement to unholster and use his Taser on Mr. Finn, Kilcoyne didn't watch where he was running and he ran into a concrete barrier in front of the store, which momentarily slowed him down.

30. Officer Kilcoyne then resumed sprinting after Mr. Finn, holding his Taser out in front of him pointed at the back of the sprinting Mr. Finn.

31. Then, without uttering another word or any kind of warning at all, Officer Kilcoyne shot Mr. Finn in the back with his Taser gun.

32. At the moment he shot the sprinting Mr. Finn in the back with his Taser, Mr. Finn:

    a.  Was suspected of having possibly committed a petty offense (shoplifting); and

    b.  Represented a threat of harm to no one (civilian or otherwise) anywhere in the vicinity.

33. At the moment he shot the sprinting Mr. Finn in the back with his Taser, Officer Kilcoyne:

    a.  Did not know who Mr. Finn was;

    b.  Had not told Mr. Finn he was not free to leave;

    c.  Had not told Mr. Finn he was under arrest;

    d.  Had not uttered the word "stop"; and

e.  Had not given any type of warning that he was about to use force or a Taser on Mr.
Finn.

34. In fact, the last word Kilcoyne said to Mr. Finn prior to Tasing him was "Cool," pursuant to
the conversation detailed in ¶25 above.

35. The Taser probes did exactly what law enforcement is trained they will do: They pierced
through Mr. Finn's skin and into his muscles and caused complete neuromuscular
incapacitation (NMI).

36. Mr. Finn's body, moving at a full sprint while completely surrounded by only concrete and
curbs, froze up, and flew forward down to the pavement face first, into the parking lot right in
front of the Dick's store.

37. NMI deprives the subject of the ability to put their hands out to catch their fall. It is both known
and trained that Tasing someone who is running across pavement in the back is extraordinarily
dangerous. It practically ensures that the subject's head and face will be slammed into the
pavement when they fall.

38. Mr. Finn's head and face in fact did slam into the pavement, in precisely the manner Taser
training warns police officers about.

39. The impact caused Mr. Finn to suffer fractures to his nasal bones, a frontal scalp edema,
traumatic straightening of the cervical spine (similar to a whiplash injury), concussion,
traumatic injury to his jaw, multiple second degree abrasions to his arms, and a deep laceration
to his chin (with bone being visible) and nose requiring numerous sutures.

40. The tasing also caused injury to Mr. Finn's heart function (ectopic atrial tachycardia).

41. Officer Kilcoyne dove on top of the incapacitated Mr. Finn and yelled "put your hands behind
    your back! Do it now!" Mr. Finn was actually still (audibly) receiving electric shock through
    the probes from the Taser as Kilcoyne yelled these orders at him, in a state of NMI, and was
    unable to move any part of his body.

42. Kilcoyne pulled Mr. Finn's helpless limp arms from the pavement to his back and handcuffed
    them. He told Mr. Finn "Don't move. You're under arrest." This was the first time in the
    encounter he said anything to Mr. Finn about being detained or under arrest.

43. "I'm not moving, sir," Mr. Finn replied.

44. "Fuck, man," Mr. Finn continued, moaning in pain, "my face. Oh shit my face."

45. Mr. Finn looked like this:



46. Officer Kilcoyne then called for his supervisor and an ambulance. While waiting for them to
    arrive, he said to Mr. Finn: "You're under arrest for resisting and then whatever crimes you
    committed in there."

47. Blood from Mr. Finn's head and face continued for several minutes to pool on the pavement.





48. In indescribable pain, Mr. Finn moaned from the ground, "This shit hurts so fucking bad." To which Officer Kilcoyne replied, "Yep. The Taser is very effective."

49. Taser training provided to FCPS officers including Kilcoyne teaches that a properly deployed Taser into an individual's large muscle groups (like the back) causes neuromuscular incapacitation (NMI) and if NMI is achieved, it locks up the person's core so they would not have use of their arms. Essentially, it paralyzes the person.

50. Taser training provided to FCPS officers including Kilcoyne also teaches that officers must have awareness of momentum when deploying a Taser. A person who is tased causing NMI while running would continue to be carried forward and would hit the ground without use of arms to brace themselves. Being suddenly paralyzed while in motion is thus almost certain to result in injury,

51. Taser training provided to FCPS officers to demonstrate the risks and dangers inherent to tasing someone who is running away even includes a video that shows a participant who is running and who, when tased, is seen to go all over the pads that were set up around him and hit his face on the floor and beyond.

52. Taser training thus teaches officers that tasing a subject in the back who is running away is therefore very dangerous to the person being tased and likely to cause injuries to their face/head.

53. Officer Kilcoyne thus knowingly utilized dangerous and excessive physical force that he was trained in these circumstances would be likely to cause serious injuries to Mr. Finn's head/face for the sole reason of preventing Mr. Finn's flight from being investigated for a possible petty theft offense.

54. FCPS written policy 309 states the following regarding "Verbal and Visual Warnings" preceding Taser use:

1. **Policy 309.4 Verbal and Visual Warnings**
   (a) A verbal warning of the intended use of the ECW should precede its application, unless it would otherwise endanger the safety of citizens or officers or when it is not practicable due to the circumstances.

55. Officer Kilcoyne knew he had not given any kind of warning to Mr. Finn that he was going to deploy a Taser on him. He knew that all Mr. Finn had been suspected of when he tased him was a petty offense. He also knew that he had failed to ever even tell Mr. Finn to "stop" or that he was under arrest. He knew these were very bad facts for him.

56. Further, Kilcoyne had deployed his Taser on a running individual in a manner that caused Mr. Finn's helpless body to be thrown out into a roadway, in the path of oncoming vehicular traffic, putting him at risk of being runover and killed.

57. So, Officer Kilcoyne next set to trying to cover up and conceal his excessive and unreasonable use of force on Mr. Finn.

58. For example, Officer Kilcoyne went inside the Dick's store to talk to the employee who had reported her suspicion that Mr. Finn was shoplifting, to get more information from her. While talking to her, he announced: "Oh, he'll get resisting arrest because I told him he is lawfully detained before he sprinted."

59. Deputy McKay similarly tried to help Kilcoyne cover up his excessive and unreasonable force, stating in his witness statement that when the subject ran away, Officer Kilcoyne "said to stop, told him to stop."

60. FCPS written policy 309 lists circumstances in which use of the Taser should be avoided

("Special Deployment Considerations"). It states:

**Policy 309.5.2 Special Deployment Considerations**
(a) The use of the ECW on certain individuals should generally be avoided unless the totality of the circumstances indicates that other available options reasonably appear ineffective or would present a greater danger to the officer, the subject or others, and the officer reasonably believes that the need to control the individual outweighs the risk of using the device. This includes:
5. Individuals whose position or activity may result in increased injury (e.g. falls from height, operating vehicles).

61. FCPS's Response to Resistance Policy (Policy 300) purports to provide rules for their

officers when using physical force:

**300.3 USE OF PHYSICAL FORCE**

(a) Officers must apply nonviolent means, when possible, before resorting to the use of physical force.
(b) Officers may use physical force only if nonviolent means would be ineffective in effecting an arrest, preventing an escape, or preventing an imminent threat of injury to the officer or another person.
(c) When physical force is used, officers may only use that amount of physical force consistent with the minimization of injury to others.
(d) When used by an officer, physical force must appear reasonably necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.

62. Defendant Kilcoyne did not apply any nonviolent means and it does not appear that he even

considered utilizing nonviolent means. Further, the force he did choose to use did not minimize

injuries. Officer Kilcoyne's use of the taser was not reasonable given the facts and

circumstances.

63. FCPS Policy 300 also provides the following factors:

**300.5 FACTORS USED TO DETERMINE THE REASONABLENESS OF PHYSICAL FORCE AND DEADLY PHYSICAL FORCE**

When determining whether to apply physical force or deadly physical force on a subject (and in evaluating whether an officer has used such force reasonably under the circumstances) officers should consider several factors as time and circumstances reasonably permit. These factors include, but are not limited to:

(a) The availability and effectiveness of nonviolent means
(b) Immediacy and severity of the threat to innocent people and officers
(c) The conduct of the subject, as reasonably perceived by the officer at the time

(d) Officer/subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of officers available vs. subjects)
(e) The effects of drugs or alcohol on the subject
(f) Subject's mental state or capacity
(g) The proximity of weapons or dangerous improvised devices
(h) The amount of restraint on the person and their ability to resist despite being restrained
(i) The seriousness of the suspected offense or reason for contact with the individual
(j) The training and experience of the officer
(k) Potential for injury to other people, officers, and the suspect
(l) Whether the person appears to be resisting, attempting to evade arrest by flight or is attacking the officer
(m) The risk and reasonably foreseeable consequences of escape
(n) The apparent need for immediate control of the subject or a prompt resolution of the situation
(o) Whether the individual no longer appears to pose an imminent threat to the officer or others
(p) Prior contacts with the individual or awareness of any propensity for violence
(q) The minimization of injuries to others
(r) Any other exigent circumstances

64. FCPS officers receive training on how to safely deploy Electronic Control Weapons (ECW) which includes the use of tasers. FCPS policy 309 clearly states:

(b)    Mere flight from a pursuing officer, without other known circumstances or factors, is not sufficient cause for the use of the ECW to apprehend an individual.

65. Later, heard on Officer's Kilcoyne's own body worn camera video, he states to a Dick's employee that "he'll [Mr. Finn] get resisting arrest because I told him he is lawfully detained before he sprinted." This is a lie. Officer Kilcoyne did not utter a single word to Mr. Finn that he was being detained or that he was not free to leave.

66. Mr. Finn suffered from a broken nose, severe injuries to his face requiring many stitches, a fractured collarbone, and numerous other bloody scrapes and contusions as a result of Defendant Kilcoyne recklessly deploying his taser.

***PATTERN OF USING EXCESSIVE FORCE ON NON-THREATENING INDIVIDUALS:***
***Defendant Fort Collins's policies, customs, practices, and/or lack of adequate training and***
***supervision caused the violations of Mr. Finn's civil rights***

67. As witnessed *supra* and as detailed below, it is the custom and actual practice of FCPS to model, ratify, and condone the use of excessive force by FCPS officers. As a result, it has become customary among FCPS officers to use unjustified and excessive force on non-threatening individuals because FCPS has communicated to its officers that such force is authorized, and, indeed, expected and when used will be defended and covered up by the supervisory and municipal apparatus of the City.

68. In fact, that is exactly what happened in this case. Defendant Kilcoyne ignored his training regarding the risk of serious bodily injury presented by tasing a sprinting person into the back without warning, knew that tasing under such circumstances was likely to cause Mr. Finn serious bodily injury, and he tased Mr. Finn anyway.

69. FCPS "investigated" this event and still found no misconduct on Kilcoyne's part. Defendant Kilcoyne ignored his training and the law. He knew (at best) Mr. Finn was suspected of having committed a petty offense (the least severity of crime). He knew nothing about Mr. Finn indicated that Mr. Finn was an exigent threat of harm to himself or the public. FCPS "investigated" that behavior and still found no misconduct on his part.

70. FCPS, following their internal "investigation," informed Mr. Finn (without explanation) that they had "exonerated" Defendant Kilcoyne with respect to Mr. Finn's complaints of excessive force and misconduct.

71. FCPS's "exoneration" of Defendant Kilcoyne despite his clear violation of training, policy, and deliberate infliction of pain and suffering upon Mr. Finn exacerbated Mr. Finn's damages and caused him to suffer even more trauma.

72. FCPS officers have repeatedly used excessive force against individuals like Mr. Finn who presented no threat to officers. For instance, in December of 2013, FCPS officers similarly brutalized Stanley Cropp, an eighty-year-old man with Alzheimer's disease and dementia. Mr. Cropp was aggressively, unjustifiably, and unreasonably tackled by FCPS officers while taking a walk in his neighborhood. Mr. Cropp was taken to Larimer County jail. The excessive force claims against the City of Fort Collins and FCPS settled for $113,000.

73. In another case in 2016, FCPS officers similarly used excessive force against another member of the community. On or about October 20, 2016, FCPS officers seized Dakota McGrath, who was suspected of third degree assault, a misdemeanor. Mr. McGrath, who had gotten out of his car and was walking in an alleyway, had earbuds in and did not hear the officer approach. The officer caught up to Mr. McGrath and struck him in the head or neck with a steel baton, causing Mr. McGrath to fall to the ground, unconscious. Mr. McGrath regained consciousness but remained on the ground, dazed, when the officer struck Mr. McGrath's leg several times with the baton, fracturing his leg in several places. On information and belief, the case was settled for an undisclosed amount.

74. In July of 2016, FCPS were called to Enan Joe Heneghan's house for a noise complaint. Mr. Heneghan turned down the music. The officer proceeded to search Mr. Heneghan's house

without a warrant and without his consent, and unlawfully and unreasonably **pepper sprayed him in the face when he refused to show officers his ID**. The City of Fort Collins settled Mr. Heneghan's case for $150,000.

75. On December 3, 2016, Sean Slatton was ordered to leave his girlfriend's sorority party after being falsely accused of bringing a flask. FCPS officer Hopkins instructed Mr. Slatton to leave, and Mr. Slatton calmly and immediately complied. Mr. Slatton stood outside to order a ride service to drive him to his hotel. Two FCPS officers (Hopkins and Barnes) followed him outside and told him he needed to leave the entire property and could not wait on or near it for his ride. Mr. Slatton replied "ok, I will [leave]" but instead of permitting him to do so, Hopkins and Barnes demanded to see his identification. Mr. Slatton refused and walked away because he had not committed a crime and so that he could comply with officer Hopkins's original order to leave. **Upon reaching the sidewalk, Hopkins told Mr. Slatton he was under arrest, and without provocation, struck him in the leg with a baton and pepper sprayed him in the face**.

76. On April 6, 2017, Michaella Surat was outside a bar in Fort Collins celebrating her 22nd birthday when police officers were called regarding an altercation inside the bar. When Ms. Surat approached officers who were speaking with her boyfriend, one officer told her to "back off" and pushed her shoulder. Ms. Surat told the officer not to touch her. The officer then grabbed and held onto Ms. Surat's wrist and put her in a rear wristlock hold. Ms. Surat repeatedly asked the officer why he was touching her and what she did wrong. The officer responded by slamming Ms. Surat face-first to the ground – clearly an excessive use of force on someone who posed no danger to the officer. Ms. Surat's chin slammed into the sidewalk, causing a concussion, cervical strain, and a large and painful contusion on her chin.

77. After video footage of Ms. Surat's encounter with FCPS surfaced, FCPS spokesperson Kate Kimble told the media that the officer used "standard arrest control," ratifying and making explicit Fort Collins' custom and practice of use of excessive force.

78. On October 6, 2017, an FCPS officer accosted Kimberly Chancellor apparently because she did not get her ID out of her purse quickly enough. He threw her face-down on the asphalt and then, while she was prone on the ground not resisting or threatening him in any way, the officer pinned her to the ground with his knee and bodyweight on his back.

79. On March 29, 2018, FCPS officers used excessive force against Natasha Patnode, a woman accused of shoplifting at a Target store. An FCPS officer struck Ms. Patnode more than 60 times with his fist or baton while she was already on the ground and restrained. Another FCPS officer arrived and the officers tased Ms. Patnode multiple times, also while she was already on the ground and restrained. The FCPC officers' use of force blatantly violated the Fourth Amendment's requirement that use of force on citizens be reasonable.

80. On August 29, 2021, FCPS officers used excessive force against Andru Kulas because he refused to accept a paper summons. Former FCPS Officer Park tried to physically force Mr. Kulas to accept the summons. Former Officer Park slammed Mr. Kulas to the ground and shoved his head into the pavement. He then violently pepper sprayed Mr. Kulas inches from his eyes, in violation of OC spray training and FCPS policy. The use of force was subsequently ratified and approved of by FCPS chain of command.

81. Defendant Fort Collins knew or had constructive knowledge, based on its history and widespread practice of its officers using excessive force and its condoning of those actions, that its officers would utilize excessive and unnecessary force against people like Mr. Finn.

82. Because Defendant Fort Collins created and tolerate a custom of deliberate indifference and has continuously failed, despite the obvious need to do so, to adequately train and supervise FCPS officers in these areas, citizens, including Mr. Finn, have repeatedly been subjected to excessive force and violations of their constitutional rights.

83. Defendant Fort Collins has fostered a policy of inaction and/or express ratification of its officers routinely violating citizens' constitutional rights, which constitutes the functional equivalent of a decision by Fort Collins itself to violate the Constitution.

84. FCPS's persistent and repeated failure to discipline its officers for their similar uses of excessive force reflects a custom, policy, or practice of encouraging, tolerating, and/or ratifying blatantly illegal and improper conduct. These encouragements, toleration of, and ratifications demonstrate that such police misconduct is carried out pursuant to the policies of and regiment of training provided by Fort Collins, and that such conduct is customary within FCPS.

85. FCPS's deliberate and conscious failure to correct prior constitutional violations based on similar conduct constituted an affirmative choice to ratify the conduct, and to send a clear message in doing so to its law enforcement officers that such misconduct is acceptable and approved. It is Fort Collins' responsibility to properly train its officers to ensure they perform their duties correctly and to discipline, rather than ratify and encourage, their improper conduct, so that officers can learn from theirs and others behavior and perform their jobs lawfully moving forward, and be deterred from engaging in misconduct that violates the constitutional rights of people with whom the police interact. Fort Collins' failure to do so has clearly communicated to FCPS's officers, including Defendant Kilcoyne, that excessive force is authorized and tacitly or explicitly encouraged.

86. Fort Collins' past ratification and toleration of similar illegal conduct thus caused and was the moving force behind Defendant Kilcoyne's use of excessive force against Mr. Finn.

87. As a result of the Defendants' violations of his constitutional rights under both the U.S. and Colorado Constitutions, Plaintiff has suffered permanent physical deformity, permanent injuries, damages, trauma, depression, loss of sleep, anxiety, pain, loss of sense of safety and facial disfigurement.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
42 U.S.C. § 1983 – *4th Amendment Violation – Excessive Force*
(against Defendant Kilcoyne)

88. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

89. Defendant Kilcoyne's arrest of Mr. Finn, in addition to being wrongful and unlawful, also utilized excessive force in violation of the Fourth Amendment.

90. No officer would consider Defendant Kilcoyne's sudden and unannounced deployment of painful force upon Mr. Finn to have been reasonable or justified under the circumstances.

91. Defendant Kilcoyne effected this assault and injury to Mr. Finn with deliberate indifference to Mr. Finn's rights under the Fourth Amendment to the U.S. Constitution.

92. Defendant Kilcoyne's sudden seizure and assault of Mr. Finn caused him to experience great physical pain, suffering, and terror. The experience of this event caused and continues to cause Mr. Finn trauma and emotional distress.

SECOND CLAIM FOR RELIEF
42 U.S.C. § 1983 – *4th Amendment Violation (Monell) – Excessive Force*
(against Defendant City of Fort Collins)

93. Defendant City of Fort Collins is a governmental entity and municipality incorporated under
the laws of the State of Colorado for purposes of liability under 42 U.S.C. § 1983 and the Fort
Collins Police Services is a department of the City of Fort Collins. Defendant City of Fort
Collins enforces local and state law through its law enforcement agency, the Fort Collins Police
Services ("FCPS").

94. Defendant Fort Collins had a duty to train and supervise Defendant Kilcoyne, Defendant Hahn
and their fellow officers.

95. At all times relevant to this Complaint, Defendant City of Fort Collins employed and was
responsible for the promulgation of policies, customs, practices and training of FCPS
personnel, including Officer Kilcoyne and Corporal Hahn.

96. Defendant Fort Collins was aware that its officers regularly arrested citizens using excessive
force and did nothing to remedy or stop it. To the contrary, FCPS would instead condone and
ratify brutal excessive force activity after the fact, making it more likely to occur in the future.

97. Both Fort Collins' failure to supervise and train Kilcoyne, as well as its aforementioned
unconstitutional customs and practices, were the moving force behind Mr. Finn's injuries.

98. Defendant Fort Collins' actions and omissions violated Plaintiff's federal constitutional rights,
and were a substantial and significant contributing cause and proximate cause of Plaintiff's
damages.

99. Defendant Fort Collins did not act upon a good faith and reasonable belief that their actions
and omissions in failing to adequately train and supervise FCPS officers in this area was lawful.

100.    The Defendants' conduct proximately caused injuries, damages, and losses to Mr. Finn.

THIRD CLAIM FOR RELIEF
*Section 13-21-131, C.R.S. – Excessive Force*
*Violation of Colorado Constitution, Article II, Section 7*
(against Defendant Kilcoyne)

101.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

102.    Defendant Kilcoyne acted under color of state law and within the course and scope of his employment as an FCPS police officer at all times relevant to the allegations in this Complaint.

103.    At all relevant times, Defendant Kilcoyne was a "peace officer" under § 24-31-901(3), C.R.S. and was employed by a local government.

104.    Plaintiff Mr. Finn had a protected interest under the Colorado Constitution, article II, § 7 in being secure in his person from excessive force by law enforcement personnel.

105.    Officer Kilcoyne employed excessive force on Mr. Finn by means that included but were not limited to, tasing Mr. Finn in the back without any verbal warning, in violation of the Constitution of the State of Colorado.

106.    Defendant Kilcoyne had no reasonable basis to believe Mr. Finn posed a threat of harm to the officers or anyone else. In fact, at the time excessive force was employed against Mr. Finn, Mr. Finn was running away from Officer Kilcoyne.

107.    The force used against Mr. Finn by Defendant Kilcoyne, as described herein, was objectively unreasonable and excessive.

108.    Defendant Kilcoyne subjected or caused Mr. Finn to be subjected to the deprivation of individual rights secured by the bill of rights of the Colorado Constitution.

109.    Defendant Kilcoyne did not act upon a good faith and reasonable belief that his actions in
        using unreasonable and excessive force against Mr. Finn were lawful.

110.    The acts or omissions of Defendant Kilcoyne were the moving force behind and the
        proximate cause of injuries sustained by Mr. Finn.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in his favor and
against Defendants, and award him all relief as allowed by law and equity, including but not limited
to:

a.  Declaratory relief and injunctive relief, as appropriate;

b.  Actual economic damages as established at trial;

c.  Compensatory damages, including but not limited to those for past and future pecuniary
    and non-pecuniary losses, physical and mental pain, trauma, fear, anxiety, loss of
    enjoyment of life, loss of liberty, loss of sense of security, and other non-pecuniary losses;

d.  Punitive or exemplary damages for all claims as allowed by law in an amount to be
    determined at trial;

e.  Issuance of an Order mandating appropriate equitable relief, including but not limited to:

    i.    Issuance of a formal written apology from each Defendant to Plaintiff;

    ii.   The imposition of appropriate policy changes designed to avoid future similar
          misconduct by Defendants;

    iii.  Mandatory training designed to avoid and prevent future similar misconduct by
          Defendants;

    iv.   Imposition of disciplinary action against appropriate employees of Fort Collins;

f.   Pre-judgment and post-judgment interest at the highest lawful rate;

g.   Attorney's fees and costs; and

h.   Such further relief as justice requires.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted this 9th day of April, 2025.

THE LIFE & LIBERTY LAW OFFICE

*s/ Sarah Schielke*
Sarah Schielke
Counsel for Plaintiff
The Life & Liberty Law Office LLC
1055 Cleveland Avenue
Loveland, CO 80537
P: (970) 493-1980
F: (970) 797-4008
E: sarah@lifeandlibertylaw.com